UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jackson Walker LLP,

        Plaintiff,

v.

Federal Deposit Insurance Corp.,

        Defendant.

MEMORANDUM OPINION
AND ORDER
Civil No. 12-2839 ADM/FLN

_____

David S. Curcio, Esq., Jackson Walker LLP, Houston, TX; and Amy L. Schwartz, Esq., Lapp, Libra, Thomson, Stoebner & Push, Chartered, Minneapolis, MN, on behalf of Plaintiff.

Barbara Podlucky Berens, Esq., Justi Rae Miller, Esq., Erin K. Fogarty Lisle, Esq., and Carrie L. Zochert, Esq., Berens & Miller, P.A., Minneapolis, MN, on behalf of Defendant.
_____

## I. INTRODUCTION

On February 20, 2014, the undersigned United States District Judge heard oral argument on Plaintiff Jackson Walker LLP's ("Jackson Walker") and Defendant Federal Deposit Insurance Corporation's (FDIC) cross-motions for summary judgment [Docket Nos. 17, 18]. For the reasons stated herein, Jackson Walker's motion is denied, and the FDIC's motion is granted.

## II. BACKGROUND

Home Savings of America ("HSOA") is a federally chartered bank with headquarters in Little Falls, Minnesota. In the summer of 2010, Dirk Adams, the CEO of HSOA, contacted James Pledger, an attorney at Jackson Walker, to discuss relocating HSOA from Minnesota to Texas. Pl.'s Index [Docket No. 26] Ex. A ("Pledger Dep.") 7.[1] On July 14, 2010, HSOA executed an engagement letter retaining Jackson Walker for the "conversion" of HSOA into a

---

[1] The parties have submitted overlapping excerpts from Jackson Walker's Rule 30(b)(6) deposition of James Pledger. See also Justi Rae Miller Aff. [Docket No. 21] Ex. A.

Texas state savings bank.  Id. Ex. B ("Retainer Agmt.") 1.  The terms of the letter also applied to any agreed-upon expansion of legal services.  Id. at 2.  The Retainer Agreement required HSOA to pay a retainer of $5,000, stating:

> Considering the nature and scope of the matter for which you have engaged us, you have provided us with a retainer of $5,000.00.  We normally expect to retain this amount during the course of our engagement.  However, at our discretion, we may apply this retainer to fees and expenses from time to time and, if we do, we may ask that it be replenished.  When our representation is completed, we will apply the balance of the retainer against our final statement and refund any excess to you.

Id.  On September 23, 2010, HSOA returned the executed Retainer Agreement and a $5,000 retainer, which Jackson Walker held in its Texas trust account.  Miller Aff. Ex. D.

HSOA's retention of Jackson Walker was part of a plan to save the bank.  On June 2, 2010—before execution and delivery of the Retainer Agreement—HSOA's holding company stipulated to the entry of an Order to Cease and Desist by the Office of Thrift Supervision ("OTS").  The OTS concluded HSOA had engaged in unsafe or unsound practices, which resulted in the bank operating with insufficient capital.  Miller Aff. Ex. G.  The Order to Cease and Desist required HSOA to develop a capital plan to achieve sufficient cash flow and establish sufficient tangible equity capital.  Id.

Adams informed Pledger of HSOA's undercapitalization when the two first discussed retaining Jackson Walker.  Pledger also independently reviewed publicly-filed information about HSOA, and learned HSOA had "problem assets."  Id. at 9.  Adams' plan was to convert HSOA into a Texas-chartered bank while simultaneously obtaining an infusion of capital, which it would then use to acquire a "large Houston mortgage banking operation."  Pledger Dep. 8.  Adams believed this plan would solve the bank's undercapitalization problem.  Id.

Adams' plan could not be executed. On November 2, 2011, the Texas Department of Savings and Mortgage designated HSOA a "problem bank." See Pledger Dep. 32-33. On November 16, 2011, the company from which HSOA had planned to obtain funding decided not to move forward. Id. at 35. On November 17, 2011, the Office of the Comptroller of the Currency (OCC) issued an "unfavorable" Report of Examination regarding HSOA, which Pledger discussed with HSOA's directors. Miller Aff. ¶ 11; Pledger Dep. 39.

Also on November 17, 2011, the date of the OCC report, Adams directed HSOA's general counsel, Laura Kayayan, to "[s]end Jackson Walker a $100,000 retainer and keep it refreshed." Miller Aff. Ex. H. Minutes later, Adams informed HSOA's other directors that he was retaining Pledger as HSOA's general corporate and regulatory counsel. Id. Ex. I. On November 18, 2011, the following day, Kayayan informed Pledger that she had approved "a payment of $100,000 (the evergreen retainer)." Id. Ex. J. Pledger informed Jackson Walker's accounting department that the firm received the $100,000 from HSOA "because they are at serious risk of FDIC receivership in the 1st quarter." Id. Ex. L.

During its representation of the bank, Jackson Walker routinely sent HSOA monthly invoices for services rendered, which HSOA then paid. Id. Ex. C ("Kayayan Dep.") 17-18; Ex. O. Jackson Walker only drew down on the retainer on one occasion, December 29, 2011, for a payment of $46,287.76. Miller Aff. Ex. N. This was the total amount of three outstanding invoices, for work performed in November and December 2011. HSOA replenished the retainer thereafter. Pledger Dep. 57.

On January 23, 2012, HSOA's acting general counsel Jonathan Jenkins recommended Pledger expedite Jackson Walker's January 2012 invoice. HSOA normally processed outgoing

3

wires on Thursdays, and Jenkins stated that expediting the invoice might allow HSOA to pay the invoice by Thursday, February 2, 2012. Miller Aff. Ex. P. Jackson Walker did not issue the invoice until February 14, 2012. HSOA did not pay the invoice.

On February 24, 2012, the FDIC became the receiver for HSOA and Jackson Walker's representation of the bank ended. Pl.'s Index Ex. H. On February 27, 2012, Jackson Walker sent HSOA two additional invoices for legal services. The FDIC, acting as receiver for HSOA, did not approve payment of either invoice. The three unpaid invoices total $66,667.57. Miller Aff. Exs. Q, R, S.

On March 6, 2012, Pledger informed the FDIC that it intended to return only $33,332.43 of HSOA's retainer, and keep the balance in satisfaction of the unpaid invoices. Id. Ex. T. On May 29, 2012, Jackson Walker submitted a proof of claim to the FDIC, contending it had a secured claim in the amount of $66,667.57. On September 12, 2012, the FDIC informed Jackson Walker that it was disallowing the secured claim, but would allow Jackson Walker to pursue an unsecured claim for the same amount.

On November 9, 2012, Jackson Walker filed this action against the FDIC, seeking a declaratory judgment entitling it to $66,667.57. Compl. [Docket No. 1]. On November 13, 2012, Jackson Walker returned $33,332.43 to the FDIC, and kept the balance of the retainer in satisfaction of the unpaid invoices. Miller Aff. Ex. U. The FDIC counterclaimed on January 15, 2013, seeking a declaratory judgment entitling it to ownership of the $100,000 retainer. Countercl. [Docket No. 6].

## III.  DISCUSSION

### A.  Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  The United States Supreme Court, in construing Federal Rule 56(c), stated in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.  <u>Kiel v. Select Artificials, Inc.</u>, 169 F.3d 1131, 1134 (8th Cir. 1999).  However, the nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." <u>Krenik v. Cnty. of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995).

### B.  FIRREA and Subject Matter Jurisdiction

The FDIC argues the Court lacks subject matter jurisdiction over this action because of the limitations stated in the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA" or the "Act").  <u>See</u> 12 U.S.C. § 1821.  FIRREA grants the FDIC authority to allow or disallow claims made against the assets of a bank in receivership.  <u>See</u> <u>id.</u> §§ 1821(d)(3)-(5).  After the FDIC makes a determination over a particular claim, the claimant has 60 days to either request administrative review of the claim or file suit on the claim in the relevant district court.  <u>Id.</u> § 1821(d)(6).

Apart from this specific procedure, FIRREA broadly limits judicial interference with the administration of a receivership. The Act states:

> Except as otherwise provided in this subsection, no court shall have jurisdiction over–
>
> (i) any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
>
> (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

Id. § 1821(d)(13)(D). FIRREA also establishes a blanket prohibition against equitable relief that restrains the FDIC's powers and functions: "Except as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver." Id. § 1821(j).

The FDIC argues the latter two provisions, §§ 1821(d)(13)(D) and 1821(j), bar the present lawsuit as an attempt to interfere with the FDIC's administration of the HSOA receivership.[2] Section 1821(d)(13)(D) sets a jurisdictional bar against "any claim or action" seeking either: (1) payment from the assets of the bank; or (2) the determination of rights with respect to the failed bank's assets. Citing a decision from this district, the FDIC argues this jurisdictional bar applies even to declaratory relief claims a party pursued through the FDIC's

---

[2] The Eighth Circuit Court of Appeals has interpreted the relevant provisions of FIRREA as restricting subject matter jurisdiction. Bueford v. Resolution Trust Corp., 991 F.2d 481, 484 (8th Cir. 1993) (addressing § 1821(d)(13)(D)); Hanson v. FDIC, 113 F.3d 866, 870 (8th Cir. 1997) (addressing § 1821(j)).

administrative process.  See Sec. State Bank of Hibbing v. FDIC, No. 13-1142, 2013 WL 5487615, at *4-5 (D. Minn. Oct. 1, 2013).

The FDIC further argues that even if § 1821(d)(13)(D) does not bar Jackson Walker's claim, § 1821(j) does.  As quoted above, § 1821(j) prohibits courts from taking any action to "restrain or affect" the receiver's "powers or functions."  Courts have characterized this provision as "a sweeping ouster of courts' power to grant equitable remedies."  Hanson, 113 F.3d at 871 (quoting Freeman v. FDIC, 56 F.3d 1394, 1399 (D.C. Cir. 1995)).  Here, the FDIC argues Jackson Walker's declaratory relief claim is an attempt to "restrain or affect" the FDIC's authority to recover funds belonging to HSOA.

Subject matter jurisdiction over Jackson Walker's claim exists under the particular facts of this claim.  Although labeled as a claim for declaratory relief, Jackson Walker is functionally seeking a de novo review of its secured claim for $66,667.57, the amount owed for legal work before HSOA entered receivership.  The FDIC does not dispute that Jackson Walker properly submitted a proof of claim and otherwise followed the FDIC's administrative process under § 1821(d)(5).  Having completed this process, Jackson Walker then had 60 days to request either an administrative review of the disallowed claim, or "file suit on such claim" in the district court.  Again, the FDIC does not dispute Jackson Walker timely filed its claim in district court.  The FDIC's only argument is, essentially, that Jackson Walker filed an equitable claim and not a legal claim, and thus is barred by § 1821(d)(13)(D) or § 1821(j).

Neither provision requires an absolute bar in these circumstances.  Section 1821(d)(13)(D) states that "except as provided in this subsection," courts shall not have jurisdiction over claims or actions for payment from the failed bank, or actions to determine

rights with respect to the failed bank. The exception expressly allows for judicial review as provided elsewhere in the subsection, and § 1821(d)(6), in turn, provides for such review. The Eighth Circuit has interpreted the interaction between § 1821(d)(6) and § 1821(d)(13)(D) as creating an exhaustion requirement: district courts cannot hear claims in connection with payment from a failed bank's assets unless the claimant has previously raised that claim in the FDIC's administrative process.

Nothing in the text of § 1821(d)(13)(D) universally bars declaratory actions. Instead, the bar is two-fold: (1) all claims seeking the right to payment from the bank's assets must be administratively exhausted, otherwise they are barred; and (2) any action or claim that seeks something other than payment from the bank's assets is barred. The Third Circuit Court of Appeals has persuasively articulated the rationale behind the distinction between "payment" and "non-payment" claims. See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. City Sav., F.S.B., 28 F.3d 376 (3d Cir. 1994). In National Union, the court held that the term "claims" in § 1821(d)(3) refers only to those claims filed with the FDIC seeking a right to payment from the bank's assets. Thus, only the parties pursuing these "payment" claims may obtain de novo judicial review under § 1821(d)(6). All other actions or claims, including "any action seeking a determination of rights" are barred from judicial review under § 1821(d)(13)(D). Id. at 387-88. One of FIRREA's primary goals, the court held, was:

> to enable the receiver to efficiently determine creditors' claims and preserve assets of the failed institution without being burdened by complex and costly litigation. With this goal in mind, it would be perfectly consistent for Congress to provide a scheme wherein a holder of a claim for payment from the assets of the failed institution would be provided an administrative remedy and de novo court review, while the holder of a claim not asserting a right of payment and who wanted only a declaration of rights against the failed bank would be provided no administrative remedy or court access.

Id. Thus, only those parties seeking "a right to payment from the failed institution's assets" have the option of filing for de novo review in district court. All other parties must await the receiver's decision to file suit against them, and then assert any relevant defenses. Id. The Eighth Circuit has cited National Union with approval. Tri-State Hotels, Inc. v. FDIC, 79 F.3d 707, 714-15 (8th Cir. 1996).

The distinction between claims seeking "a right to payment" and claims seeking a legal determination of some other right relative to the bank is critical here. In National Union and Tri-State, the plaintiffs sought the right to rescind contracts they had made with a bank that subsequently failed. These plaintiffs did not seek a right to payment under § 1821(d)(3), but rather sought broader determinations of their rights relative to the banks. As a result, the appellate courts held § 1821(d)(13)(D) barred the plaintiffs' claims for declaratory relief. Here, however, Jackson Walker seeks a determination of its right to payment from HSOA's assets, and it is doing so after having filed an administrative claim raising the same issue. A determination regarding whether Jackson Walker is entitled to payment from HSOA's assets is precisely the kind of "claim" National Union deemed appropriate for de novo judicial review.

Stated another way, Jackson Walker's claim is not primarily equitable in nature, but rather seeks a right to payment. If Jackson Walker had immediately returned the retainer to the FDIC after HSOA entered receivership, Jackson Walker would almost certainly be in the same position it is in now. Jackson Walker would have filed an administrative claim for a secured interest in $66,667.57 of the retainer. The FDIC would have disallowed this claim and instead allowed Jackson Walker to pursue an unsecured claim for this amount—exactly as the FDIC has proceeded in this case. Then, Jackson Walker would have filed suit for breach of contract in the district court, and the issue of whether Jackson Walker has a secured interest in the retainer

would again be at issue, just as it is now. Thus, as this hypothetical demonstrates, Jackson Walker's claim for declaratory relief is essentially a claim for the payment from HSOA's assets. This is only further borne out by the FDIC's filing of a counterclaim alleging the retainer belongs to HSOA: further indication that this case is chiefly about the disposition of bank assets, and not some determination of legal rights.

Several decisions support this conclusion. National Union held, in dicta, that denying a declaratory action seeking a right to payment could constitute a deprivation of due process:

> In contrast, where an action is not merely declaratory in nature, but rather asserts a right to payment, a complete bar to such a right-to-payment action in administrative proceedings and in courts of law would appear to constitute an unconstitutional deprivation of due process, since the holder of the right to payment would never have an opportunity to be heard concerning property already allegedly owed her.

Nat'l Union, 28 F.3d at 390-91 (emphasis original). Other courts have allowed for the possibility of declaratory claims under § 1821 as well. See, e.g., Tri-State, 79 F.3d at 715 n.12 (discussing Third Circuit decision, stating "the administrative claims procedures and the jurisdictional bar have concurrent scope, which suggests that declaratory judgment actions could be raised in the administrative forum") (citing Hudson United Bank v. Chase Manhattan Bank of Conn., N.A., 43 F.3d 843, 849-50 (3d Cir. 1994)); see also Freeman, 56 F.3d at 1403-05 (holding plaintiffs could have filed administrative claim, and then de novo claim in district court, "seeking a determination" regarding their obligations to the FDIC); Henderson v. Bank of New England, 986 F.2d 319, 321 (9th Cir. 1993) ("The statute bars judicial review of any non-exhausted claim, monetary or nonmonetary, which is susceptible of resolution through the claims procedure.") (quotation omitted, emphasis added).

Similarly, § 1821(j) does not bar Jackson Walker's claim. Although § 1821(j) broadly

10

limits the use of equitable claims to "restrain or affect" the FDIC's authority, the claim in this case imposes no such restraint. In the cases cited by the FDIC, the courts found a lack of subject matter jurisdiction under § 1821(j) because the requested declaratory relief had the functional effect of restricting or invalidating action taken by the FDIC. See, e.g., Dittmer Props., LP v. FDIC, 708 F.3d 1011 (8th Cir. 2012) (plaintiff sought declaratory judgment invalidating loan agreement); see also Sec. State Bank of Hibbing, 2013 WL 5487615, at *4-5 (plaintiff sought declaratory judgment challenging terms of sale conducted by FDIC).

Conversely, Jackson Walker's claim is functionally, if not expressly, an attempt to seek a de novo determination under § 1821(d)(6) regarding the disposition of assets held by HSOA. If disputing the FDIC's decision with regard to bank assets was automatically an attempt to "restrain or affect" the FDIC's authority, there would be no reason to allow the filing of administrative or judicial claims in the first place. See Carney v. Resolution Trust Corp., 19 F.3d 950, 958 n.3 (5th Cir. 1994) ("Naturally, we do not hold that § 1821(j) would bar all actions for declaratory relief against the receiver of a failed financial institution."); Village of Sugar Grove v. FDIC, No. 10 C 3562, 2011 WL 3876935, at *8-9 (N.D. Ill. Sept. 1, 2011) (finding subject matter jurisdiction over declaratory relief claim, holding: "We do not read § 1821(j) to prohibit us from declaring the parties' rights under [a pre-petition agreement], or to require us to accept the FDIC's interpretation of it."). As a result, the Court has subject matter jurisdiction over Jackson Walker's claim, and will address the merits of the dispute.

**C. Security Interest in Retainer**

The underlying dispute between the parties is relatively straightforward, concerning only whether Jackson Walker has a valid security interest in the $100,000 retainer paid by HSOA. If Jackson Walker has a secured interest, it is essentially a preferred creditor in the receivership. If

Jackson Walker does not have a secured interest, it must pursue an unsecured claim for payment of its work.

Under both Minnesota and Texas law, a party can only obtain a security interest in money if the party does so in accordance with the Uniform Commercial Code (UCC).  The parties agree that Minnesota and Texas have adopted the UCC in relevant part, and that Minnesota and Texas law materially agree in interpreting the relevant provisions; as a result, no conflict of laws analysis is required.  The parties also agree an attorney's security interest in a retainer only attaches in compliance with the UCC.[3]  Under the UCC, a security interest in money attaches when: (1) "value has been given"; (2) "the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party"; and (3) "the collateral . . . is in the possession of the secured party . . . pursuant to the debtor's security agreement."  Tex. Bus. & Com. Code Ann. § 9.203; Minn. Stat. § 336.9-203.  Both parties also agree that a security interest can only form in accordance with a valid security agreement.

The parties primarily disagree over whether a valid security agreement existed.  The FDIC argues the Retainer Agreement between HSOA and Jackson Walker did not reflect an intent to form a security interest.  The FDIC further argues that the subsequent emails between HSOA and Jackson Walker did not create a security interest, nor did the emails validly amend the Retainer Agreement to increase the amount of the retainer to $100,000.  Jackson Walker responds that no "magic language" is required for the formation of a security interest, and that the Retainer Agreement reflected the contracting parties' intent for Jackson Walker to take

---

[3] Some states, such as Iowa, allow attorneys an automatic "retaining lien" on client funds held by the attorney.  Neither Texas nor Minnesota law allow such a lien, and even if they did, FIRREA would pre-empt such state law.  See Hill v. Imperial Sav., 852 F. Supp. 1354, 1374-75 (W.D. Tex. 1992) (collecting cases).

possession of the retainer funds to ensure payment for legal services. The law firm also argues its emails with HSOA either validly enlarged the retainer or reflected an independent intent to create a security interest.

The UCC defines "security agreement" as "an agreement that creates or provides for a security interest." Id. (citing Tex. Bus. & Com. Code Ann. § 9.102(74)); Minn. Stat. § 336.9-102(74) (accord). A security agreement does not need to take "any particular form," or include any specific wording, to create a valid security interest. Excel Auto & Truck Leasing, LLP v. Alief Indep. Sch. Dist., 249 S.W.3d 46, 65 n.7 (Tex. Ct. App. 2007). Nevertheless, the agreement must reflect an objective or manifest intent to form a security interest. See In re Hardage, 99 B.R. 738, 740 (Bankr. N.D. Tex. 1989); Vacura v. Haar's Equip., Inc., 364 N.W.2d 387, 392 (Minn. 1985). "Generally, the test for creation of a security interest is whether the transaction was intended to have the effect as security," because the parties must intend their transaction to fall within the scope of the UCC. Morgan Bldgs. & Spas, Inc. v. Turn-Key Leasing, Ltd., 97 S.W.3d 871, 876 (Tex. Ct. App. 2003).

The Retainer Agreement does not objectively reflect an intent to create a security interest in the retainer paid by HSOA to Jackson Walker. In the letter, Jackson Walker wrote that it would "normally expect to retain this amount during the course of our engagement," but that it could "at [its] discretion" apply the retainer to the payment of fees and expenses "from time to time." Jackson Walker could also "ask that [the retainer] be replenished." Retainer Agmt. at 2. Although the FDIC is not entirely persuasive that all security agreements must include words such as "security" or "collateral," the language in the Retainer Agreement does not logically reflect the creation of a security interest. The Retainer Agreement does not commit the retainer to Jackson Walker as a means to ensure HSOA's timely payment of invoices; on the contrary,

the agreement suggests an alternative method of payment. Cf. Morgan Bldgs., 97 S.W.3d at 881 (finding security agreement, and not alternate method of payment, where operative documents provided for foreclosure and disposition of certain assets upon "events of default").

This conclusion is supported by the Retainer Agreement's statement that Jackson Walker would "apply the balance of the retainer" against HSOA's final statement, instead of returning the retainer in full to HSOA upon the completion of its obligation. Retainer Agmt. at 2. Here, the Retainer Agreement's language demonstrates the retainer served as "advanced payment," because the retainer could be applied to the payment of invoices, and it would be used to resolve HSOA's final balance. See St. Cloud Nat'l Bank & Trust Co. v. Brutger, 488 N.W.2d 852, 854 (Minn. Ct. App. 1992). In such cases, the retainer is held in trust by the attorney as property of the client until it is applied to the payment of invoices. See id.; see also In re Office Prods. of Am., Inc., 136 B.R. 964, 971 (Bankr. W.D. Tex. 1992). The record undisputedly reflects that, despite the easy opportunity, Jackson Walker made no move to draw down on the retainer until well after HSOA entered receivership. But by that point, the retainer—which Jackson Walker held in trust for HSOA—had already become an asset of the receivership.

Jackson Walker cites bankruptcy law decisions to support its argument that it perfected a secured interest in the retainer when it performed the underlying work. See,e.g., In re Matthews, 154 B.R. 673, 676 (Bankr. W.D. Tex. 1993). But the Matthews court assumed without expressly deciding that the retainer at issue formed a valid security interest in pre-petition fees. See id. at 676. As discussed above, no valid security interest existed under Texas or Minnesota law in the funds held by Jackson Walker. The Bankruptcy Court in this district has recognized that in the absence of a valid security interest, a legal retainer remains the property of the client until counsel actually draws on the retainer. See In re Brick Hearth Pizza, Inc., 302 B.R. 877, 880-81

(Bankr. D. Minn. 2003) (citing In re Mahendra, 131 F.3d 750, 756 (8th Cir. 1997)); see also In re Office Prods., 136 B.R. at 971 (stating general proposition that retainer belongs to client) .

Even if the Retainer Agreement created a security interest, the subsequent November 2011 emails did not validly amend the Retainer Agreement to require a $100,000 retainer. See Pl.'s Index Ex. F. Although the UCC may not require a signed writing for the creation or modification of a security interest, the Retainer Agreement does. The agreement expressly requires any modification of its terms to be made only in a "writing signed by both parties." Retainer Agmt. at 3. As a result, Jackson Walker's argument that its email exchange with HSOA validly expanded the retainer is not persuasive. While emails could in theory alter a security interest, the parties here adopted a contract that required more than "authenticated" documents. See Tex. Bus. & Com. Code Ann. § 9.203(b) (stating possession of collateral must occur pursuant to security agreement). Further, the November 2011 emails did not independently create a security interest. In the email dated November 17, 2011, HSOA CEO Adams directed HSOA's general counsel to establish a $100,000 retainer and "keep it refreshed." Pl.'s Index Ex. F. In the email dated the next day, the general counsel requested an invoice from Jackson Walker. These emails do not objectively reflect an intent to form a security interest.

In light of the above analysis, Jackson Walker's claim for declaratory relief is denied, and the FDIC's mirroring counterclaim for declaratory relief is granted. It is hereby declared that Jackson Walker did not have a secured interest in the $100,000 retainer fee it held in trust for HSOA. Jackson Walker must therefore return to the FDIC any balance of this amount not already paid, and may then pursue the collection of its legal service fees as an unsecured creditor.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.	Plaintiff Jackson Walker LLP's Motion for Summary Judgment [Docket No. 17] is **DENIED**.

2.	The FDIC's Motion for Summary Judgment [Docket No. 18] is **GRANTED**.

3.	All claims in the Complaint [Docket No. 1] are **DISMISSED WITH PREJUDICE**.

4.	Count 1 of the Counterclaim [Docket No. 6] is **DENIED**,[4] and Count 2 is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


　　　　s/Ann D. Montgomery　　　　
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  April 16, 2014.

---

[4]  The record indicates Jackson Walker has already returned a portion of the funds at issue, and it appears unlikely that the funds at issue are at risk.  Thus, the FDIC's request for an injunction holding the funds in trust until the resolution of this matter is denied unless Jackson Walker appeals, in which case the FDIC may seek appropriate relief.